## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                       )
SAMUEL J. FURROW and ANN FURROW,       )
                                       )
                 Plaintiffs,           )
                                       )
v.                                     )        Civil Action
                                       )        No. 14-10497-PBS
WRIGHT NATIONAL FLOOD INSURANCE        )
COMPANY and UNDERWRITERS AT            )
LLOYD'S LONDON,                        )
                                       )
                 Defendants.           )
_____)
```

### MEMORANDUM AND ORDER

November 17, 2016

Saris, C.J.

### INTRODUCTION

Plaintiffs Samuel and Ann Furrow bring this suit seeking excess flood insurance coverage for the loss of their vacation home after a storm in March of 2013 in the Town of Nantucket, Massachusetts. Plaintiffs allege the loss qualifies as a "flood" under the "erosion" prong of their Standard Flood Insurance Policy ("SFIP"). Defendant Underwriters at Lloyd's London ("Lloyd's"), the excess insurer, asserts that the loss was not covered because the cause of the loss was gradual erosion of a sandy bluff overlooking the Atlantic Ocean, which was a specifically excluded cause of loss under the policy.

Both parties moved for summary judgment. After hearing, Plaintiffs' Motion for Summary Judgment (Docket No. 61) and Defendants' Motion for Summary Judgment (Docket No. 58) are **DENIED**.

## FACTUAL BACKGROUND

The facts below are taken from the record, and are undisputed except where stated.

## I.   The Policy

Plaintiffs Samuel and Ann Furrow purchased their summer home in Nantucket in July 2003. The home is located at 87 Baxter Road atop a 75-foot bluff on the easternmost portion of the island of Nantucket. When the home was purchased in 2003, the home was over 50 feet away from the bluff.

Due to erosion rates at the bluff, Plaintiffs knew it might become necessary to move their house away from the bluff at some point in the future. By 2007, the bluff had moved to within 20 feet of the home, so Plaintiffs moved the house closer to the road and away from the bluff. After the move, the home was about 60 feet away from the bluff.

Plaintiffs purchased insurance for their home. In addition to standard home insurance, Plaintiffs also purchased primary and excess flood insurance. For the policy period from February 12, 2013 to February 12, 2014, Plaintiffs had two flood

insurance policies – a primary policy issued by Wright National
Flood Insurance Company[1] with limits of $250,000; and an excess
policy with additional limits of $1,450,000 sold by Lloyd's. The
scope of the coverage under the excess flood policy is governed
by the SFIP, issued pursuant to the National Flood Insurance
Program Act ("NFIP"), 42 U.S.C. § 4001 et seq. The SFIP provides
for the following coverage: "We will pay you for direct physical
loss or damage by or from flood to your insured property." The
SFIP defines "flood":

> A. . . . Flood, as used in this flood insurance policy,
> means:
>
> 1. A general and temporary condition of partial or
>    complete inundation of two or more acres of normally
>    dry land area or of two or more properties (at least
>    one of which is your property) from:
>
>    a. Overflow of inland or tidal waters;
>
>    b. Unusual and rapid accumulation or runoff of surface
>       waters from any source;
>
>    c. Mudflow;
>
> 2. Collapse or subsidence of land along the shore of a
>    lake or similar body of water as a result of erosion
>    or undermining caused by waves or currents of water
>    exceeding anticipated cyclical levels that result in a
>    flood as defined in A.1.a. above.

Standard Flood Insurance Policy section II.A..

---

[1] Wright was formerly known as Fidelity National Indemnity
Insurance Company.

Certain causes of damage are explicitly excluded from coverage:

> B. We do not insure for loss to property caused directly by
> earth movement even if the movement is caused by flood.
> Some examples of earth movement that we do not cover are:
>
> >   1.   Earthquake;
> >   2.   Landslide;
> >   3.   Land subsidence;
> >   4.   Sinkholes;
> >   5.   Destabilization or movement of land that results
> >        from accumulation of water in subsurface land
> >        area; or
> >   6.   Gradual erosion.
>
> We do, however, pay for losses from mudflow and land
> subsidence as a result of erosion that are specifically
> covered under our definition of flood (see II.A.1.c. and
> II.A.2.).

Id. section V.C.

## II.   **The Storm**

From March 6-9, 2013, a storm hit Nantucket with near gale force winds, a storm surge, and high waves ("Storm"). As a result of this Storm, a portion of the bluff upon which the house sits collapsed into the ocean. Two days after the Storm ended, the home was condemned by the Nantucket Building Commissioner as unsafe for human use. In April 2013, the home was demolished.

Within days of the Storm, Plaintiffs made a claim for the loss to Wright and Lloyd's. Plaintiffs reached a settlement with Wright for the $250,000 policy limit. Lloyd's determined that the loss was not covered. Plaintiffs seek a declaration that the

excess policy is obligated to cover the full value of the
dwelling up to the policy limit.

**DISCUSSION**

I.   **Summary Judgment Standard**

Summary judgment is appropriate when there is "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed
on a motion for summary judgment, the moving party must
demonstrate that there is an "absence of evidence to support the
nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657,
661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S.
317, 325 (1986)). Once such a showing is made, "the burden
shifts to the nonmoving party, who must, with respect to each
issue on which [it] would bear the burden of proof at trial,"
come forward with facts that demonstrate a genuine issue. Borges
ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)
(citing Celotex, 477 U.S. at 324). "Where, as here, there are
cross motions for summary judgment, we evaluate each motion
independently and determine 'whether either of the parties
deserves judgment as a matter of law on facts that are not
disputed.'" Matusevich v. Middlesex Mut. Assur. Co., 782 F.3d
56, 59 (1st Cir. 2015) ((citing Barnes v. Fleet Nat'l Bank,
N.A., 370 F.3d 164, 170 (1st Cir. 2004) (quoting Wightman v.

5

Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996))).

## II.  **Law Governing Flood Insurance**

In enacting the National Flood Insurance Act ("NFIA"), Congress found, among other things, that "many factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions." 42 U.S.C. § 4001(b). "The NFIP is a federally-subsidized program which provides flood insurance at below actuarial rates." Berger v. Pierce, 933 F.2d 393, 394-395 (6th Cir. 1991). In 1973, Congress broadened the Act by adding to the definition of "flood" as follows: "[T]he collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels . . . ." 42 U.S.C. § 4121(c); see also Berger, 933 F.2d at 399 ("The concept of flood now includes a type of erosion: erosion caused by high levels of water in a lake or other body of water . . . . The touchstone for coverage is a finding of waves or currents of water exceeding anticipated cyclical levels."); 44 C.F.R. § 61, App. A(1) (defining flood in the standard policy).

Federal common law governs the interpretation of the flood insurance coverage under the NFIP. See Matusevich, 782 F.3d at

6

59. As a means to promote uniformity of decision in cases
involving the NFIP, "[t]he law is clear that, as contracts,
SFIPs issued under the National Flood Insurance Program ("NFIP")
are governed by federal law applying standard insurance law
principles." McHugh v. United Serv. Auto Ass'n, 164 F.3d 451,
454 (9th Cir. 1999). "However, in enacting the NFIP, Congress
did not intend to abrogate standard insurance law principles."
Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 135 (1st Cir.
1984) (citing Drewett v. Aetna Cas. & Sur. Co., 539 F.2d 496
(5th Cir. 1976)). Courts are free to apply the "'traditional
common-law technique of decision' by drawing upon standard
insurance principles." Id. (citing West v. Harris, 573 F.2d 873,
881 (5th Cir. 1978)).

     "Insurance policies are generally interpreted in the same
way as other contracts," the dominant purpose of which is to
"give effect to the intentions of the parties." Eagle-Picher
Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 17 (1st Cir.
1982). "Where the relevant language is unambiguous and the
application of the policy to the relevant facts is clear, . . .
[the] intent [of the parties] must be ascertained by the plain
and ordinary meaning of the contract language." Id. If, however,
the policy remains ambiguous, "the policy is generally construed
in favor of the insured in order to promote the policy's
objective of providing coverage." Id. Regarding insurance

contracts in particular, there is a "well-settled principle of construction that insurance contracts are construed liberally in the insured's interest and strictly against the insurer." <u>Atlas</u>, 725 F.2d at 136.

The insured bears the burden of proving the loss is within the description of the risks covered. <u>See</u> <u>Highlands Ins. Co. v. Aerovox, Inc.</u>, 676 N.E.2d 801, 804 (Mass. 1997) (internal quotation marks excluded). It is then the burden on the insurer to prove that an exclusion applies. <u>Id.</u>; <u>Murray v. Cont'l Ins. Co.</u>, 48 N.E.2d 145, 147 (Mass. 1943). If the insured seeks to rely on an exception to the exclusion, then the burden shifts back to the insured to prove that some exception to the exclusion applies. <u>Highlands</u>, 676 N.E.2d at 804-805.

## I.   <u>Gradual Erosion</u>

Defendants contend Plaintiffs' claim is not covered because it resulted from ongoing, gradual erosion which is excluded under the SFIP. To support their contention that the loss on Plaintiffs' house was caused by gradual erosion, Defendants presented evidence that the coastal erosion on the sandy bluff at 87 Baxter Road was frequent. The average rate of erosion in the vicinity of Plaintiffs' property from 1990 to 2005 ranged from 2.0 to 12.7 feet per year, Docket No. 60 at 13, and during the thirteen months from November 2012 to December 2013, the

land eroded approximately thirteen feet. Id., Ex. 4 at 48. Even though Defendants admit the bluff at 87 Baxter Road eroded as a result of the Storm, Defendants contend this erosion was common for the area and typical of gradual beach erosion. Moreover, they assert the precise amount of bluff erosion that occurred during the Storm is "undetermined". Docket No. 60 ¶ 16.

Plaintiffs assert that the SFIP provides coverage for "erosion." Section II.A.2. of the SFIP defines flood as a "[c]ollapse or subsidence of land along the shore of a lake[2] or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a flood as defined in A.1.a." In addition, although the policy excludes "gradual erosion," the SFIP states: "We do, however, pay for losses from mudflow and land subsidence as a result of erosion that are specifically covered under our definition of flood (see II.A.1.c. and II.A.2.)."

To meet their threshold burden of demonstrating that the erosion that caused their loss was covered, Plaintiffs submit that the bluff generally eroded 3-5 feet per year. Docket No. 64 ¶ 4. At the beginning of 2013, Plaintiffs state the top of the bluff was 20-30 feet away from their home and at the general

_____

[2] Defendants concede that an ocean qualified as a "similar body of water."

rate of erosion, it would have taken 2-3 years for the gradual

erosion to threaten their home. Plaintiffs contend that a fact-

finder could reasonably find that during the four days of the

Storm, 20-30 feet of the bluff precipitously collapsed into the

ocean. Even with Defendants' evidence that the bluff was

gradually eroding at a rate of up to 13 feet a year, Plaintiffs'

evidence that the erosion was a result of the Storm was at least

20 feet is sufficient to create a disputed issue of fact as to

whether the exclusion applies. Accordingly, when all facts are

viewed in favor of Plaintiffs, a fact-finder could reasonably

find that the loss after the Storm was not due to "gradual

erosion."

## II.   Anticipated Cyclical Levels

The parties do not dispute that there was a "collapse or

subsidence of land," but Defendants do dispute that the collapse

was caused by "waves or currents of water exceeding anticipated

cyclical levels." Plaintiffs' expert, Stephen Harned, a

meteorologist, defines "anticipated cyclical levels" using

statistical wave data collected by the National Oceanic and

Atmospheric Administration from 1982-2008 at Buoy #44008

("Nantucket Buoy") for the month of March when the event

occurred. This data shows the historical average level of waves

near the Nantucket Buoy (located 50 miles southeast of

Nantucket) during the month of March to be 11.2 feet or less.[3] Docket No. 67, Ex. 14, Harned Report, at 9, 15-16, 25. Based on this data, Plaintiffs contend the "anticipated cyclical levels" of waves during March is 11.2 feet or less.

Harned then calculated the wave heights during the Storm to determine if they exceeded "anticipated cyclical levels." First, Harned collected data from Buoy #44017 ("Montauk Point Buoy," southeast of Long Island, NY) to determine the wave heights at the Montauk Point Buoy during the Storm. Harned used data from the Montauk Point Buoy instead of the Nantucket Buoy because the Nantucket Buoy became unmoored a few weeks before the Storm, rendering the data unreliable. He then calculated the height of the waves at the bluff using the data from the Montauk Point Buoy. Because the calculated height of the waves at the bluff during the Storm ranged between 12 and 29 feet, Harned concluded that the level of the waves at the bluff during the Storm were double – and almost triple - the historical level of waves at the Nantucket Buoy in March, and thus, the waves during the Storm exceeded "anticipated cyclical levels."

Defendants attack Plaintiffs' expert report in two ways. First, they define "anticipated cyclical levels" "as waves or currents at levels that could be expected, even if higher than

[3] The average wave height is 2.2 meters with a standard deviation of 1.2 meters.

average, in light of seasonal variations in sea and weather conditions." Docket No. 71 at 3. Defendants rely on a comparative storm analysis performed by one of their experts, Dr. Lloyd Schulman, a meteorologist, to define "anticipated cyclical levels." Analyzing data from January 2003 to January 2016, Schulman identified fourteen other storms of similar force as the Storm, leading him to conclude that storms of this force occur on average once per year. Specifically, Schulman found that "[a]lthough each coastal storm is unique, the other 14 storms . . . were comparable in both wind speed and wave heights with peak speeds near 20 m/s and maximum significant wave heights in the open ocean near 6 meters." Docket No. 60, Ex. 17, Schulman Report, at 11. Thus, since the maximum wave heights during the Storm were within the range of expected wave heights during these yearly Nor'easters, the waves during the Storm were anticipated and thereby did not exceed "anticipated cyclical levels."

Plaintiffs argue that Defendants' definition of "anticipated cyclical levels" is not supported by the plain language of the policy because it would calculate only the anticipated water levels during storms, rather than the long-term historical anticipated water levels in March. The primary case Plaintiffs rely on is unpublished, but it is helpful because it suggests that the proper methodology is looking at

long-term water level data. See Berger v. Pierce, No. 91-3982, 1992 WL 393595 (6th Cir. Dec. 22, 1992) (unpublished) (concluding that long-term water level data, instead of "a statistical snapshot" of a particular year should be used in determining "anticipated cyclical levels").[4] Based on the plain and ordinary meaning of the contract terms, the Court concludes that the term "anticipated cyclical levels" is not limited to anticipated cyclical storm levels alone. Neither the statute nor the contract so limit the term "anticipated cyclical levels." Even if there were an ambiguity as to the meaning, ambiguous policy terms are construed in favor of the insured. As such, Defendants' definition fails.

Plaintiffs don't win yet though, because Defendants' second challenge is to Plaintiffs' expert's calculations of "anticipated cyclical levels" and the height of the waves during the Storm. Defendants' experts question the methodology used to convert the wave heights at the buoy to the wave heights at the bluff. For example, the Defendants' experts contend that Harned made a number of assumptions in his calculations: that the "wind direction is constant at 20 degrees along that entire fetch" and

---

[4] Defendants argue this decision is no longer persuasive because it pre-dates the National Flood Insurance Reform Act of 1994, Pub. L. No. 103-325, 108 Stat. 2160, 2255, which repealed Congressional finding (g) addressing "erosion and undermining of shorelines by waves or currents." However, the statutory term "anticipated cyclical levels" remains in the statute.

also that the velocity of the wind stayed constant over the
entire length the waves travelled from the buoy to the bluff.
Docket No. 67, Ex. 16, Sykora Dep., at 52-53. Additionally,
Defendants challenge Mr. Harned's reliance on a buoy that was
600 miles away. Id. at 51. The methodological challenges were
not well briefed and are better addressed in the context of a
Daubert hearing.

### III. Definition of Flood

Defendants argue that there is no evidence the Storm
resulted in a "flood" as defined in section II.A.1.a. of the
insurance policy as required by section II.A.2., and therefore
Plaintiffs' loss is not covered.

Plaintiffs contend that the waves exceeding anticipated
cyclical levels resulted in inundation from tidal waters. To
meet the requirement that two or more acres of normally dry land
area were inundated by an overflow of tidal waters, Plaintiffs'
submit evidence that the beach and bluff up and down Siasconset
Beach, including 87 Baxter Road, were inundated. The Court has
an insufficient basis for concluding that the beach area is
"normally dry," or that the inundation involves "two or more
acres," or two or more properties, at least one of which is
Plaintiffs'. Moreover, the facts are unclear and disputed as to
where the property line is located on the bluff and beach.

14

Additionally, Plaintiffs point to several other spots on the island that were flooded as a result of coastal flooding during the Storm – Hulbert Avenue; Washington, Broad, Easton, and Easy Streets; and Sheep Pond Road. Docket No. 67, Ex. 14, Harned Report at 14-16, 20. Although the entire record is hard to read, all of these streets appear to be on different sides of the island from where the Furrows' house was located. Plaintiffs' expert states that "surge and wave flooding covered several streets and adjacent properties in the town of Nantucket which exceeded 2 acres in size." Docket No. 67, Ex. 14, Harned Report at 4. Defendants state that these other properties are not appurtenant to Plaintiffs' property. The plain language of the policy does not require that the properties be adjacent, but it does require that the collapse of land on the bluff result from erosion caused by the waves exceeding anticipated cyclical levels and that these waves result in the inundation defined by the policy (i.e., the two acres or the two properties). The record contains insufficient evidence for the Court to conclude that the flooding in other parts of the island was caused by such waves.

In sum, each party is calling the other's bluff because the record is inadequate for this Court to determine whether there is a "flood" as defined in the policy.

## ORDER

Plaintiffs' Motion for Summary Judgment (Docket No. 61) and Defendants' Motion for Summary Judgment (Docket No. 58) are **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge